Thank you, Your Honor. May it please the Court, my name is Bill Weyand. Together with Anna Lumlesky, I represent Millennium Pharmaceuticals. The bortezomib-menitol ester, which is the subject of the patent for you in this appeal, was a new compound. Bortezomib itself was not suitable for administration to patients and therefore was not suitable as a therapeutic for the treatment of the devastating disease, multiple myeloma. It was the new compound that was covered by the claims of the 446 patent that made treatment, now known as Velcade, as described to you in the briefs, a medical reality. How do you get around all of the arguments that were made in the arbitration? I mean, those are what we litigators refer to as really bad facts, aren't they? Actually, Your Honor, I think, I'm not sure getting around is what I'll do, but I think I can address those. And let me do it now, because in the arbitration, there was an argument. No one was contesting that there was an invention, that this new compound was an invention with extraordinary properties that have made people's lives better, longer. The question was, who made the inventive contribution? We have never disputed that lyophilization was known. We have never disputed that Manitoulin was known. And there was back and forth between the two of them, between the respective groups, as to who made the inventive contribution. At the end of the day, what they recognized is they did collectively, because at the end, lyophilization with Manitoulin to create the Bortezomib Ester is what led to this new compound. And I think, Your Honor, the way we get around it is this. In order to not recognize that the Bortezomib Manitoulin Ester was a new compound, the district court actually committed five legal errors. If I summarize them very quickly, I think that actually goes to the heart, because what was said in the arbitration between people who were competing for inventorship positions doesn't go to these five issues. And the five issues, legal issues, are these. The district court did not apply this court's lead compound analysis. It doesn't even mention it. And, in fact, at page 812, it identifies the closest prior art as Bortezomib. But at page 820, it describes the closest prior art as the glycerol ester of Bortezomib. Now, under this court's decisions, it could be both. It could be one or the other. But there has to be some indication that there was a motivation to multiply to obtain a new compound. And if I could draw the court's attention to our brief at page 13, you'll see the chemical structures of the two. These are distinctly different compounds. That's the first error. The second error is their expert, really their only witness, identified 17 really undifferentiated prior art references. And when we asked him, is there a specific combination, a specific combination that would have made it obvious, he said, I can't give you one. I don't have one. In fact, he started with 51 before the trial, brought it down to 17 during his testimony. Completely undifferentiated. And that error relates to the first, which is, if you haven't gone through the analysis and you then move to a series of prior art references, not identifying what the combination is, it's a problem. And this case actually captures it because there was— Well, given those—several of the errors that you complain about are things where you think that the trial court's analysis fell short. So the question is, is this a situation where we should, if we agreed with you on those points, vacate and remand for the court to explain itself? Or are you saying that this is a situation in which the evidence wouldn't support the conclusions of the court? Your Honor, we would say that at a minimum it would justify a vacate and remand. But I think we would go one step further, and I think I can tell you why. Because there is—if I focus on the only articulation of any motivation combined, it's at page A-19 of the opinion. And there are only four things that are referred to. The first is their expert's testimony without identifying any prior art, just stating the conclusion that he thought it would have been obvious, and that's not enough. The second was some 30B-6 testimony, but when you look at the testimony, the testimony is by someone who's testifying about personal experience, not prior art, with a different compound than bortezomib and a different ester. The third was testimony, as we've described to you, by Dr. Anderson, where if you look at the testimony, it actually says the opposite of what the district court cited it for, and the defendants have not made any effort to justify or to support that conclusion. And the last is this. The last is a reference to the Adams patent itself, and the quote from the court's opinion is, the Adams patent pointed directly to Manitou. The Adams patent doesn't mention Manitou at all. It does mention 10 dihydroxy compounds. None of them are Manitou. It says nothing about lyophilizing with Manitou. It says nothing about creating an ester of Manitou with bortezomib. There literally is nothing in when the district court says it pointed directly to Manitou. It's saying that it's pointing to something that's not even mentioned. If that's the evidence the defendants produced on the motivation to combine, then we would suggest that it's a failure to prove by clear and convincing evidence. If you assume that the two possible lead compounds are bortezomib and the glycerol ester, and you assume that this is the only evidence of a motivation to combine, that would be enough to find the patent not valid. And as you think through, the different errors are actually related, because not going through the lead compound analysis becomes a problem that's compounded by this undifferentiated group of 17 references. If you move to unexpected results, identifying a different closest prior art, the glycerol ester, than what was identified eight pages before, makes it very hard for us as the patentee to identify that which we should attack in order to justify the patent. So I've sort of jumped to the fourth, but if I take the third. So the first is the failure to engage in the lead compound analysis. The second is not specifically combining prior art references. The third would be trying to use an inherency doctrine, which this court has addressed in par, to sort of fill the gap. And much of the opinion is about the obviousness of a process, but when you're synthesizing chemicals, when you're making a new chemical, many of these processes are new. When you're changing one radical, it's a process that's been well-known. It's the result that's the key. And having focused on the process, and many times these processes will be known, the district court had to fill the gap with the inherency doctrine, but there are really three problems with that. The first is it's a doctrine that this court has said to be narrowly circumscribed when you're dealing with obviousness. The second is the court has said it must be tethered to the prior art. There must be some piece of prior art that makes it inherent. This goes back to the second error we've identified, which is having not identified what the specific prior art is, it's very difficult to conclude what was inherent and what wasn't. Was there any prior art showing reactivity of the hydroxyl groups or showing that mannitol during lyophilization would react? I think it's two parts, Your Honor. The Adams patent describes the possibility of creating esters with dihydroxies. Everybody agreed that there are literally millions of dihydroxy compounds. There are ten that are identified in the Adams patent. None of them are mannitol. To move to the second half of your question, there was no discussion in the patent about lyophilizing with mannitol to create a bulking agent or to create an ester. And so there was nothing that would teach that. There was, to go to Judge O'Malley's first question, to be sure, there were publications on lyophilizing. There were publications on lyophilizing with mannitol. But this is a critical distinction and I think goes to this problem of not identifying the specific prior art. The patent itself identifies ten dihydroxy compounds. In order to make their obviousness case, the defendants had Dr. Repp to testify that from all these dihydroxy compounds, there are actually a half a dozen that one of ordinary skilled merit would have considered if you were lyophilizing as a bulking agent. That's different than creating a new compound. There is no overlap between the two. The compounds that he identified as the obvious ones that one of ordinary skilled merit would have considered are nowhere in the Adams patent at all. So the heart of the question is, is there anything in the prior art that would suggest that lyophilizing bortezomib with mannitol would have produced the new compound, the ester, with the solubility and the stability and dissociation properties that have made it really a significant medical advance? The answer to that would be no. If you look at the history of what occurred in this case, we had people at the National Cancer Institute and the University of Kansas working for two years to try to come up with a formulation because everyone knew bortezomib had great therapeutic potential, but no one could figure out how to make it a medical reality. And if it were as simple as taking a reference off the shelf that talked about lyophilization, taking another reference off the shelf that talked about mannitol, which were describing a process to create basically a structure to hold the therapeutic and not a new compound, it would have been done before. And the reason it wasn't done, Your Honor, which I think answers both parts of your question, is this. If you have a compound that has the potential to treat a disease as significant as multiple myeloma and you're trying to get it into patients, the last thing you want to do is to change the compound. Because if you do, you run the risk that the therapeutic properties no longer be there. And so the real genius of this invention, the real innovation, is the solubility problems were solved. The stability problems were solved. It could go into patients, and bortezomib after dissociation could treat the cancer. Before this invention, there was no way to do it. And the only way we got to finding the claims to this new compound invalid were to focus on the process rather than the compound. To not focus on the specific pieces of prior art, but just to sort of toss them up and say it's obvious. To use inherency in a place that this court has never used it before. And then when we got to unexpected results, there were two things. One was the idea that you compare determined unexpected results to prior art that doesn't exist, that's never been created, never been tested, never been fabricated. This court has not only not required that, but it has said that it's not required. And then to suggest that in order to show unexpected results, you have to show precisely what would have been expected. By definition, particularly in the area of therapeutics, unexpected results are the results of innovation and invention that gives new, better, and meaningful results, which is precisely what happened here. I'll reserve the rest of my time for rebuttal if that's all right. Thank you, Mr. Lee. Thank you. Commissioner Lora. Thank you, Your Honor. May it please the court. The judgment of the district court should be affirmed. The fact findings made after a full trial show that one skilled in the art would have been motivated to lyophilize bortezomib with mannitol, and the ester would form. The formation of the ester is inherent. The fact findings were clear that it would inevitably form. The evidence on these issues came from not just Dr. Repta and the prior art, but also from the witnesses that Millennium, either Crawford or people that were Millennium, were related to the named inventors. That's really the heart of the debate, isn't it? The leap from basically using a bulking agent for purposes of making a powder and actually synthesizing a new compound. Well, the use of mannitol in lyophilization procedures was, of course, known and mannitol was highly popular. Both Dr. Anderson, the Millennium expert, and Dr. Repta testified to that. But mannitol was also known in the prior art to react with compounds like boronic acids to form esters. So it's not as though the chemistry was unknown or unexpected chemistry. In fact, Dr. Snow, who was Millennium's expert, testified at A1692 that the prior art would have told a person of ordinary skill in the art that the ester would form, and one would have expected that. But it doesn't say that this specific ester would be formed and that it would be such that as soon as you put it in water, it separates again. And this seems to be something for which I saw nothing in the prior art. The Adams patent itself taught that the esters would separate. Adams itself taught that the esters were prodrugs. Dr. Anderson admitted that having the claimed esters from the Adams patent in pharmaceutical compositions would show that they are indeed intended to be prodrugs. Well, we know it's a new product, and here there is an unexpected property. What is one to ignore the properties of the new product? The properties of the mannitol ester are that the bortezomib-free acid is stabilized, and the testimony was that that was exactly what one would have expected by lyophilizing the bortezomib with the mannitol improves stability. Dr. Stella testified to that in addition to Dr. Repta. But I'm still having a problem with the difference between your exercise for purposes of using mannitol as a bulking agent for creating powder and actually getting to the ester. I mean, didn't Dr. Repta himself admit that the ester was a new compound? The mannitol ester had not been made before these particular people did. The esters themselves were taught and claimed in the Adams patent, but Dr. Repta did... Not the mannitol ester in the Adams patent. The mannitol ester is... Your Honor, the mannitol ester is covered by the claims in the Adams patent. It is not specifically called out in the Adams patent. The Adams patent teaches esters of bortezomib, and Dr. Repta testified that one would have expected an ester to form, and Dr. Repta also testified that one would have expected the mannitol ester to provide improved stability, and he cited prior art that specifically supported that expectation. That was the Brown and Korczak references that he relied on. And Dr. McCubbin... Why wasn't your expert able to point to actual portions of these many prior art references that he felt could be combined? I mean, didn't you see that as a huge gap in your presentation? Actually, the trial testimony has about 22 pages of testimony from Dr. Repta where he goes through individual prior art references, sometimes one at a time, sometimes a few at a time, and what Dr. Repta did was put together that plausible rationale for putting those references together just as Judge Sleet found in his opinion. So what we had, unlike the Coito case that was cited by Millennium in their brief, we had discussions of at least five different points where specific prior art was called out. So at A1149, mannitol was common for freeze-drying. A1165, mannitol esters of boronic acids were known. And with each of these five points, A1166, 70, and 71, by trial exhibit number and sometimes by name, these references were called out and identified as one example. And I saw that. The problem is that it seemed more like these are out here, and so you would have grabbed them all and somehow figured out a way to put them together. I don't see an actual discussion in your expert's testimony of what one of skill in the art would have perceived in terms of understanding how you would put these together and why it would be obvious to put them together. One skilled in the art, Dr. Repta did testify that one skilled in the art would have been motivated to lyophilize bortezomib with mannitol and specifically called out the prior art that supported that, some of which I just referenced. And the inherent result of that is the formation of the ester. Dr. Repta also testified that as a matter of chemistry... Can you point to me the pages of the trial testimony that you think most clearly represent his testimony, that one of skill in the art would have been motivated to combine specific prior art references with an understanding that there would be a likelihood of success? A1149 to 1171 is the discussion of the prior art references. Well, that's a lot of pages. Where does he get to the precise testimony that I'm concerned about? With regard to the expectations, A1169... ...is testimony at around line 18 that you would want to form the ester because we know from the art that the esters stabilize the boronic acids against degradation and that the mannitol ester would likely be more soluble than bortezomib itself. And that's building on prior testimony where he's gone through the prior art references, specifically identifying them. So at A1149, the use of mannitol in freeze-drying is identified, and that was confirmed by Dr. Anderson and Dr. Lye. At A1165, the formation of mannitol esters in the prior art is identified. At A1166, Dr. Repta gives the identification of the specific prior art references at lines 1 and 2 that he's relying on for that, and Dr. Adams and Dr. Snow confirmed that in their testimony. The dissociation, the prodrug aspect, that was at A1166, and he pointed to the Babcock book, and Dr. Anderson confirmed that the esters do hydrolyze in water, and the Adams Table 2 confirms that as well. And then the stability of the boronic acids through ester formation was at A1170 and A1171. Those were the Brown and Korczak references, and that was confirmed by Dr. McCubbin. At A1335, one skilled in the art would have been motivated to do exactly what is claimed here, to make a lyophilized ortezomib with mannitol. The formation of the ester is both an inherent result that is obtained, it is inevitable, and it is what one would have expected. Judge Sleet made those findings. At A17 and A18, he discussed the inherency, and at A19, he discusses the expectations in terms of the ester formation, the improved stability of the ester, and the improved solubility, the dissociation. Now, counsel mentioned that the district court said at A19 that Adams pointed directly to mannitol. I don't know if I quoted counsel exactly, but that's what I have in my notes. That's not what the district court said. The district court did point directly to what Adams teaches, which is that the esters can be used in pharmaceutical compositions and they would be prodrugs. And Table 2 of the Adams patent confirms that because it compares esters to free acids, and the activity of three of the four esters is virtually identical, showing that the ester is freely dissociating to the free acid, which is the active. What did Dr. Ruptin mean when he said at 1185 that solubility is not an issue in this case? That seemed strange to me. He says that the POSA would know that solubility would be increased. Then he went on to say he didn't think solubility was even an issue. He did say he didn't think solubility was an issue really in this case, but it would be increased. The apparent solubility would increase because you have a separate species. But isn't solubility at the heart of this question? Stability was at the heart of the question in the trial court. Stability was what the experts testified about. That's the motivation that would have led ones skilled in the art to have lyophilized bortezomib with mannitol. It was that improved stability that provided the motivation. So in that sense, I guess Dr. Ruptin's testimony about solubility was that there would be an increase, but the stability motivation was what Dr. Ruptin relied on. Stability, it was stable, was it not? The issue wasn't stability of the lyophilization, was it? The stability improvement of the free acid came about through the lyophilization with mannitol, Your Honor. And that improvement was expected. Dr. Stella himself said there was nothing inventive about that. The arbitration papers said there was nothing inventive about lyophilizing mannitol. Excuse me, lyophilizing bortezomib. And the reason for that was that there was an expectation that that free acid would be improved in terms of its stability through lyophilization. Dr. Stella testified he would have been remiss not to try lyophilization. I won't say his name correctly, but Dr. V, who was the associate of Dr. Gupta, said he expected lyophilization to solve the problem. Dr. Repta pointed to prior art about improving stability with lyophilization. And Dr. Stella said there was nothing innovative, or it was not innovative.  But all of this means that this depends on your inherency argument, right? Well, the inherency argument certainly leads to the conclusion of obviousness, but there also was an expectation from the chemistry that the ester would form and would have improved stability, and that was... Well, but Tarleford seemed to think that the inherency piece of it was a necessary piece in the puzzle to get from point A to point B. I'm not sure I read it that way, but certainly the inherency gets you there, so in that sense it's necessary. Well, have you ever seen any case law where we've applied inherency to render a new compound or a single structural limitation obvious? We have the case involving plasma concentrations, which the court said were inherent from the teaching of the formulation in the prior art, or the obviousness of the formulation from the prior art, and the plasma concentrations are only achieved if you have the right formulation. In other words, if you have a formulation that isn't the right formulation, you're not going to get the right plasma concentrations. Right, but that wasn't a case that was actually using inherency to find a structural limitation, right? It was a case which found inherency on the plasma concentration, which that plasma concentration is achieved by the structure of the formulation itself, and the par TWI case doesn't speak just in terms of a property as being applicable for the inherency doctrine. It talks about limitations of claims, and if the limitation of a claim is the natural result of what would have been obvious from the prior art, then that limitation can be met inherently under an obviousness analysis, and that's exactly what we have here. We have an obvious combination of bortezomib, mannitol, and lyophilization, and the natural result of that is the formation of the mannitol ester. Dr. Repta, Dr. Adams, Dr. Snow, Dr. McCubbin, they all testified as to the inevitability. Dr. McCubbin said it all goes very quickly. Dr. Snow says the prior art would tell you that it would form. Dr. Adams said he immediately thought the ester had formed, and he didn't view it as inventive. He's not an inventor. He was asked, are you okay with that? He says, I'm okay with that. That was at A1594-95. What happened here was people did what routine formulators do. Council keeps talking about a new chemical compound. The person of ordinary skill in the art here is a pharmaceutical formulator. That was agreed by both parties with slightly different definitions and adopted by the court. What we have in the end are pharmaceutical formulators doing what pharmaceutical formulators do, taking the obvious steps and getting to the natural result, which is the mannitol ester. That would mean every chemical compound is obvious or unpatentable because obviously when you put chemicals together and they react, that reaction is something that you may or may not expect, but ultimately occurs. Well, Your Honor, I would say that the reactions themselves form products. However, you have to be motivated to do the specific chemical reactions with the specific ingredients at the specific conditions that would get you to that result, and that's why most chemical compounds that are new and not otherwise suggested by the prior art, they then become patentable. There's nothing that disqualifies obviousness from the fact that where you're motivated to do something and you get the natural result of doing it, then the invention is obvious, absent some secondary consideration. So in the ordinary case— No, but you're arguing that you're not motivated to actually put it together to get the end result. You're actually arguing that you're motivated to do something else. Here it's both. You're motivated to stabilize through the lyophilization with mannitol, but you're also motivated to form the ester, and Judge Sleet found that at A19 and the improved stability of the ester. Except that you don't know the ester is going to form or what properties it's going to have. But you're saying that that's inherent, or at least the district court said it was inherent. The inventors may not have known that it formed, but one skilled in the art would have expected it to form based on the chemistry and what was taught in the art. With the perfect hindsight of a successful experiment. Well, the evidence of record was that the prior art actually suggested ester formation. This was a chemical reaction between the boronic acids and mannitol that was known and taught in the art, and Dr. Repta identified six particular mannitol esters that had been created in the prior art and published in the prior art. So there was a suggestion not only to do what the inventors did, but there was a suggestion that you would get the result that they got in addition to it being an inherent result. Okay. Any more questions? Any questions? Okay. Thank you, Mr. Maloro. And would you add the time we ran over to Mr. Lee's time? Let me make these five points quickly. To go to your question, there is nothing in the prior art that describes lyophilizing with mannitol to create an ester. There's nothing in the prior art that describes using lyophilizing with mannitol to create gortezimate ester. That's why the combination becomes particularly important. That's point one. Point two, at A, 1195 to 96, Judge Romali, to go to your question, I asked Dr. Repta on cross, do you have a specific combination? And he said, no. This is after he had given the testimony given here. And here's the reason it becomes important. The defendants have given you a series of citations to mention the different pieces of prior art. For a couple, Dr. Repta had suggested that those prior art references indicated that stability could have been achieved with the mannitol ester of gortezimate. When we cross-examined him, there were two, brown and atoms. When we cross-examined him, he said, I can't find it in brown, and actually it's not in atoms. That's why the articulation of a specific combination is so important, so people can know what the target is to shoot at. The third point is this. There is nothing in atoms. Atoms is the only piece of prior art that describes gortezimate in any way. There is nothing in atoms that talks about what you should do to get greater solubility and greater stability. There's not a word about it. That's why this ester became so important. The fourth point is this. Just one more after this. The fourth point is that the district court did say, and a predicate of the opinion was, the atoms patent pointed directly to mannitol. That's at A16. I wasn't trying to characterize the opinion. That's precisely what he said. The last thing is this. Judge O'Malley, we don't think that there's any inherency decisions of this court in the opposite context that supply a missing structural feature of a compound, nor do we think there are any that provide a basis for finding a compound inherent itself. The reason is this. All of the experts agree that the question of whether you got the gortezimate ester of mannitol, that had the properties that Velcade has, was dependent upon the different conditions, the different experimental conditions, the different solvents. And you'll see from the record that there are actually a host of experiments with lyophilization by the folks at Kansas, working with the folks at the National Cancer Institute that were unsuccessful. At the end, Velcade is a new compound. And in fact, the ester itself was one that combined two compounds from before and actually had the risk that it would affect the therapeutic properties of gortezimate because it was attached close to the operative site. The fact that these inventors, applying techniques to Judge O'Malley, that's for sure. When they had their arbitration, they were saying, were known techniques. And we don't contest that for a second. But using known processes and known techniques, they came up with a new compound with a new structure, never disclosed in the prior art, that has allowed people to live better and live longer. Your biggest problem here is that a district court could have made specific findings of fact. And the district court may not have articulated everything perfectly, but the district court specifically found that there was a rational motivation articulated by Dr. Repta with respect to this compound. And how do we get over that? Your Honor, I think there are two ways. One is that, this goes to your question about reversal remand. It's important that whatever the reasons are, they be articulated within the analytical framework that this court has defined. Because if it's not, then we don't know if the legal requirements you set forth have been satisfied. We don't really, to use my example of Brown and Adams, we don't really know how to attack them, because we don't know what they're using them for. So I think the question of going through the late compound analysis, identifying a specific combination, dealing with the inherency doctrine as it exists today, not having different prior art when you get to unexpected results. These are all part of the analytical framework and legal issues. The factual issues, Your Honor, not to repeat what I said earlier, but if you go to A19, which is the only place, bottom of A18 and A19, where they address the question of the evidence for motivation combined, there is Dr. Rector's conclusion not tethered to any prior art at all, which this court has said is not sufficient. There is a 30B6 testimony of someone not testifying about prior art, testifying about a different compound and a different ester. There is, thirdly, the testimony of Dr. Anderson, which I think we all agree now doesn't say what it's cited for. And lastly, there's the question of whether the Adams patent points directly to Manitou. So if we agreed with you that those were inadequate bases for a motivation to combine, we wouldn't have to question some of the other findings, the fact that you attacked the teaching way? That's true. If that's the predicate, and even if we assume that the analytical framework had been properly done, that would be insufficient to sustain a clear and convincing evidence burden to invalidate the patent. Thank you. Any more questions? Any questions for Mr. Reed? Thank you. Thank you. Thank you both. The case is taken under submission.